# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 26, 2011 Session

## GEORGE ARTHUR LEE SMITH v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamblen County**
**No. 09CR113     John Dugger, Judge**

**No. E2010-00488-CCA-R3-PC-FILED-JANUARY 30, 2012**

Petitioner, George Arthur Lee Smith, appeals from the Hamblen County Criminal Court's denial of his petition for post-conviction relief, in which he alleged that he received the ineffective assistance of counsel at trial. Specifically, Petitioner argues that trial counsel was ineffective for the following reasons: 1) for failing to move to suppress a recorded conversation between Petitioner and a co-defendant; 2) for failing to argue at trial the forfeiture by wrongdoing exception to hearsay as rebuttal to the State's theory of motive; 3) for failing to call Petitioner's mother and stepfather as witnesses at trial; 4) for failing to move to strike the testimony of Petitioner's sister at trial; 5) for failing to request a jury instruction regarding corroboration of accomplice testimony; 6) for failing to request a limiting instruction concerning evidence of Petitioner's prior bad acts; 7) for failing to assert intoxication as a defense; and 8) for failing to object to improper comments by the prosecutor during voir dire and closing argument. Petitioner also contends that the post-conviction court erred by not allowing hearsay testimony from Petitioner's mother at the post-conviction hearing. After a careful review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, J., joined. DAVID H. WELLES, SP.J., not participating.

George Arthur Lee Smith, *Pro Se*, Wartburg, Tennessee.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Victor J. Vaughn, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

*Facts*

Petitioner was found guilty of premeditated first degree murder by a Hamblen County jury on March 23, 2006. Petitioner was sentenced to life in prison. On appeal, this Court affirmed Petitioner's conviction and sentence. *State v. George Arthur Lee Smith, et al.*, No. E2006-00984-CCA-R3-CD, 2007 WL 4117603 (Tenn. Crim. App., Nov. 19, 2007), *perm. app. denied* (Tenn., Feb. 25, 2008). The facts, as summarized by this Court in the direct appeal, are as follows:

> Chad Smith, an agent with the Tennessee Bureau of Investigation ("TBI") testified that the District Attorney's Office asked him in July of 2003 to investigate the victim's [Don Wilder] disappearance because the victim was an important witness in multiple pending drug cases. The victim had last been seen with Defendants Jarnigan and Smith, so he interviewed them. During that interview, he asked them how they knew the victim and about the last time they had seen the victim. Defendant Smith told him that he had been good friends with the victim but had not seen him for about a week.
>
> Agent Smith testified that Defendant Smith told him that the victim had called Defendant Smith "out of the blue" and wanted to visit. Defendant Smith said that he invited the victim over, and they talked for a while before deciding to go and purchase some beer. Defendant Smith said that they got into the gray van that the victim was driving and went inside a market to buy beer. While inside the market, the victim got into an argument with a Michael Bullington, who was driving a blue Volkswagen. Defendant Smith said that the victim and Bullington argued about the victim being a snitch.
>
> Agent Smith said that Defendant Smith told him that after they left the market they drove toward the victim's house, which is located near a boat access ramp. As they pulled in, they saw Bullington near the ramp in his Volkswagen. The victim and Bullington engaged in a verbal confrontation, after which Bullington drove away. Defendant Smith told the agent that they attempted to follow Bullington, but their van ran out of gasoline. After they went back to the victim's house, switched cars, and picked up the victim's son, they continued to drive around for a while. Defendant Smith said that, as they were driving around, the victim started

-2-

to slur his speech, and the Defendant noticed the victim "shooting up" drugs. The Defendant, who was driving the victim's car, saw Bullington near Little Shannon Mountain Road. When he stopped the car, the victim jumped out of the car and began chasing Bullington.

The agent testified that Defendant Smith claimed this was the last time he saw the victim. Defendant Smith went to his sister's house where he called the victim's father, who told him to bring back the car and the victim's son. Defendant Smith told the agent that he could not get the victim's car started again, so he asked his sister to take him and the victim's son to the victim's father's house, where they made arrangements for someone to come later and pick up the victim's car.

The agent asked Defendant Smith where he lived, and the Defendant said that he stayed at different motels located near Exit 4. He said he had used false names, including James Jones, to procure the motel rooms. Defendant Smith also told him that he did not own a gun, but he carried a knife for protection. During this brief second interview, the Defendant attempted to describe the location where he last saw the victim, telling the agent that the victim ran between two trailers located near the intersection of Little Shannon Mountain Road and Jaybird.

Agent Smith went to multiple motels off of Interstate 81 near Exit 4, and he found a room registered to a James Jones at the Crown Inn. He also found that rooms had been rented at the Hillcrest Inn on June 25th and 26th in the name of George Smith and Lee Smith. The agent also confirmed, by reviewing the telephone records of the Defendant's cell phone, that there were calls made between the Defendant's cell phone and the victim's residence before 7:00 a.m. on June 26, 2003, around the time that the victim became missing.

Agent Smith testified that he executed a search warrant for a small trailer where Defendants Smith and Jarnigan had stayed. During the search, the agent placed the two Defendants in the back of a police car outfitted with a device that recorded the conversation between the two. That recording, played for the jury, included the following discussion between the two Defendants relevant to this case:

[Defendant Jarnigan]:.... They know what happened to [the victim] too.

....

[Defendant Smith]: You don't know nothing about [the victim]....

[Defendant Jarnigan]: If you go[,] I'll come bail you out. Okay. Just ... just say it was yours and I didn't know nothing about it.

[Defendant Smith]: Alright. Come bail me out ... alright? ... know nothing about [the victim].

[Defendant Jarnigan]: ... He said something about you know what happened to [the victim] and something that we're all gonna have a discussion about it. I said I....

....

[Defendant Smith]: Just stick to the story.... They'll probably get me for the scales and ... if they don't find it. Okay. You know all that shit[']s hid over, ones over....

....

[Defendant Smith]: .... f* *k the dope ... about [the victim].

[Defendant Jarnigan]: Well I don't know.

[Defendant Smith]: I don't know nothing about [the victim]. I'm just telling the truth I'm gonna tell em [sic] the truth. You know, you know I don't know what happened.

[Defendant Jarnigan]: That one's Chris Smith right there.

[Defendant Smith]: I know. He's homicide.

[Defendant Jarnigan]: He's .... you ...

[Defendant Smith]: The search warrant wasn't for the dope....

....

[Defendant Smith]: I need to read that mother f* *king search warrant .... didn't show me no [sic] search warrant.

[Defendant Jarnigan]: Ask, holler at dude and ask him.

[Defendant Smith]: I need to, I need to read the search warrant man. F* *k that. I ain't [sic] got no gun I ain't [sic] got nothing, nothing here that'll link us. Clothes, shoes, nothing.... What I mean is ... I still go, I, I, I, don't have no [sic] new shoes.

....

[Defendant Smith]: I need to read the search warrant.... I want to know if you are searching for f* *king evidence due to a homicide or you searching for f* *king drugs. What are you searching for?

On the tape, both Defendants discussed the legality of the police action executing the search warrant. They wanted to know what the police sought. Several times, Defendant Smith indicated that he used the scales he had in the house for weighing Defendant Jarnigan's medicine. He said that she sometimes had to take half a pill, and he used the scales to ensure she took precisely half a pill. Defendant Smith told Defendant Jarnigan to tell the police that she did not know anything, and he would do the same, unless they were both charged and then he would "have to say it's mine." Defendant Smith then said he smoked but did not sell the drugs. Later, he expressed concern that perhaps he sold drugs to an undercover police agent. Defendant Smith told Defendant Jarnigan to get him out of jail if he was arrested, and, when she did, he was "gone."

After listening to the recording and speaking with the Defendant's sister, Agent Smith requested to search Pine Brook Lane in Morristown for items related to the victim's disappearance, such as a gun or bloody clothing. The Agent also searched an area near Hillcrest Inn where a witness saw Defendants Smith and Jarnigan walking with the victim. There, he found a Levis tri-fold wallet containing the victim's identification near a bullet.

Agent Smith spoke with Defendant Smith again, on August 20, 2003, after the Defendant called him and requested that they discuss the search warrant that the agent executed. The agent and Teddy Collingsworth, an

investigator from the District Attorney's Office, met with Defendant Smith. Agent Smith asked Defendant Smith to inform Collingsworth about the last time that the Defendant saw the victim. Defendant Smith stated that the victim had called him, and the first time they met was at the Hillcrest Inn. The agent noted that this story differed from what the Defendant had previously told him. Agent Smith confronted Defendant Smith with the discrepancies in the story and then played him the portion of the tape recording made in the police cruiser, in which Defendant Smith discussed a bloody shirt.

Agent Smith testified that Defendant Smith began to cry and told him that he shot the victim. He then provided the agent with a lengthy written statement in which he described how the killing occurred. In the statement, Defendant Smith first stated that he graduated from high school and received an Associates Degree in psychology. The Defendant stated that he requested the meeting with Agent Smith and that he spoke with him voluntarily. Defendant Smith then stated that he had previously incorrectly told the agent that he last saw the victim when the victim jumped from the car that they were riding in together. He said that, around the time of this murder, he was staying at the Super 8 Motel at Exit 8 in Morristown. Defendant Smith said that one day he was at his sister's house when two men came by driving a green Suburban. Neither of them got out of the car, but the driver handed him something wrapped up in a newspaper and told him, "I got something for you. When he gets off the hill, you shoot him. You get dropped off somewhere or you get in the trunk, and then you shoot him." Defendant Smith took the paper, which contained a black pistol. Defendant Smith said that he discussed trying to fake the victim's death, and he tried to give the gun back several times.

Defendant Smith stated that early on the morning of June 26, 2003, the victim called him on his cell phone while Defendant Smith was staying at the Hillcrest Inn at White Pine. After Defendant Smith told the victim where he was staying, the victim said that he would "stop by." When the victim arrived, the victim was "high" and gave Defendant Smith a hockey shirt. The victim suggested that they pick up his car, which was at his house, so they could party all day. Defendant Smith agreed, and, while on the way to the victim's house, they stopped at a market where the victim got into an argument with a man named Michael Bullington. They then drove back to the victim's house where they saw Bullington again, and the victim got out and ran after Bullington throwing rocks at him.

-6-

Defendant Smith further stated that at the victim's house they got another car and picked up the victim's son, who fell asleep in the car. They went back to the motel, and the phone rang about five minutes later. The caller asked if the victim was there and then said to keep him there. As soon as the Defendant hung up the phone, someone came to the door with an "eight-ball" of cocaine, which was half powder and half hard. The person delivering the cocaine said that Defendant Smith did not "owe" for it. After this delivery, Defendant Smith and the victim proceeded to get "high."

Defendant Smith said that the victim revealed that he believed that people wanted to kill him because his court date was approaching. Defendant Smith showed the victim his gun to ease his mind that Smith would not let anybody get the victim. The two went outside behind the motel, and the victim said that he needed to go to the bathroom. He and the Defendant walked toward a water tower located behind the motel. They then both urinated while standing back-to-back. Defendant Smith said that, while the victim urinated, the Defendant pointed the gun at the back of the victim's head. In describing this moment, he said:

I was thinking about how I needed money to get my license and a place to stay. A lot of other things ran through my mind about how I needed clothes, and how I didn't want to sell drugs anymore. I then was convicted by God that I shouldn't shoot [the victim]. I lowered the gun and the gun went off as I was lowering it.

The Defendant stated that he was scared and ran back to the motel. He took the victim's son, still asleep in the car, back to the victim's father's house. Later, he threw his clothes in a dumpster. Two days after this incident, he remembered that he left at the scene a beer bottle that he had been carrying when he shot the victim. He drove himself back to the place where he shot the victim, picked up the bottle, and saw that the victim had maggots around his eye. He covered the victim with some grass from the open field and threw the beer bottle in the dumpster. The Defendant expressed remorse for this killing.

After giving this statement, Defendant Smith agreed to allow Agent Smith to intercept conversations between Defendant Smith and Defendant Allen. Defendant Smith also went back to the murder scene with the agents. Additionally, Defendant Smith took the agents from the Hillcrest

Inn to Roe Junction, where he had thrown out the pistol. Defendant Smith also took Agent Smith to the Super 8 Motel where he said that he had stayed the night of the murder. He pointed out the dumpster where he disposed of his bloody clothing.

Agent Smith identified a tape recording of a conversation between Defendant Smith and Defendant Allen that occurred while Defendant Smith was wired by the police. In that recording, Defendant Allen asked Defendant Smith if he "is police now." Defendant Smith said "no," and Defendant Allen asked why Defendant Smith came to his house. Defendant Smith then said that he was getting ready to leave, and he needed to talk to Defendant Allen about a private matter. Defendant Allen expressed concern that the police were watching his house and would come for him any day. Defendant Smith told Defendant Allen not to tell anyone anything, and Defendant Allen said that everyone in the town knew what had been done. Defendant Allen then said, "[W]hat I told you the other night I was not lying to you and I told you what to tell him and then you all pull into my house...." The two arranged to speak later while Defendant Smith was at his house in White Pine.

During the later conversation, Defendant Smith told Defendant Allen that he "need[ed] to know man if it's cool with dude before I leave." Defendant Allen told him that a man, later identified as Mike Brassfield, was with Defendant Allen and "it's cool." Defendant Smith asks to speak with Brassfield, and Defendant Allen states, "he's drunk, he's singing and everything[;] he's real drunk ." Brassfield then got on the phone, and Defendant Smith told Brassfield that Defendant Smith was preparing to leave town. He asks Brassfield, "is that taken care of," and Brassfield guaranteed that "it" was. Defendant Smith asked, "[I]s it in the ground or what?" Brassfield responded, "hey, you saved my brother's life."

On August 27, 2003, the Sheriff's Department told Agent Smith about skeletal remains were found on River Road. The remains were scattered over the hillside, so the agent called the University of Tennessee Anthropology Department to come and help them recover the remains. The agent testified that he found a skull with a hole, consistent with a bullet hole, in the back. Portions of the remains led them to 1441 River Road, which was 300 yards from the original search sight. Agent Smith noted the considerable distance between where police found the body and where, according to Defendant Smith, the murder occurred. The location where

Defendant Smith indicated the murder had occurred was in Jefferson County, but the body was found in Hamblen County. The agent also received blue jeans and other bones gathered from the remains site. Additionally, he received a blood sample from the victim's sister. He sent the jeans, bones, and blood to the TBI laboratory for DNA comparison.

Agent Smith said that he also interviewed Defendant Jarnigan as part of this investigation, and she gave a statement in which she discussed, among other things, the gun used to shoot the victim. In that statement, she provided information about a gun in the Roe Junction area. She drew a diagram of where the gun was located. Defendant Jarnigan admitted in the statement that she previously lied about the last time that she saw the victim. She revealed that the last time she saw him was at the Hillcrest Inn, when the victim showed up at the motel room that she had rented. He started using cocaine, and, shortly thereafter, Darrell Horton came to the hotel room with more cocaine. About an hour later, Michael Bullington showed up in a Suburban and came inside with about two eight-balls of crack and a couple of morphine pills. Bullington left, and the victim continued using cocaine and drinking beer.

In her statement, Defendant Jarnigan said that she left the motel with the victim in his van at around 5:00 p.m. They stopped at a market where the victim got into an argument with Michael Bullington after Bullington called him a snitch. They left and ran out of gas near a boat dock by the victim's house. The victim got some gas from his house, they all got into the victim's Oldsmobile, and picked up the victim's son. The group drove back to the motel, and they left the victim's son asleep in the car while they went inside the motel.

Defendant Jarnigan said that she had spoken with her friend Renee Simpson a couple of times during the day of these events to plan a trip to the store. When she returned to the motel room with the victim, the victim began using drugs again, and she called Simpson. Simpson picked up Defendant Jarnigan at around 7:30 or 8:00 p.m., and they went to three grocery stores where Defendant Jarnigan said she used her food stamp card and spent around $150.00. Simpson and Defendant Jarnigan returned to the motel, where she saw the victim's son still asleep in the car. She said that she went into her room, Defendant Smith's sister arrived, and they took the victim's son home. Defendant Jarnigan said that she did not know what happened to the victim but that she heard several people bragging that they

-9-

killed him. She said she never asked anyone for money as a result of killing the victim.

Defendant Jarnigan also provided the agent with a map that depicted where he could find the gun. On December 17, 2003, the police found a .380 high point semi-automatic pistol with a laser sight and a clip or magazine in the area described by Defendant Jarnigan.

On cross-examination, Agent Smith testified he did not recall whether Defendant Smith told him that the shooting was accidental. Agent Smith reviewed the tape again and recalled that the defendant told him that "after I changed my mind and [the gun] went off," referring to the shooting. He agreed that the Defendant told him that he panicked after the shooting and left several things behind.

Richard Carr, with the Department of Human Services, testified as the keeper of records for the food stamps program called Families First. He determined that, in June of 2003, Defendant Jarnigan received such benefits. Carr testified that he could track when any individual used their food stamp card, and each transaction showed the date, time, amount of the transaction, and the balance of the benefits. Carr testified that if Defendant Jarnigan used her E.B.T. account, his records would reflect that use. In fact, she had an eight-cent balance as of June 26, 2003, with the last transaction shown on June 7, 2003, at the West Side Market at 7:55 p.m.

Todd Davidson, a detective with the Morristown Police Department, testified that he worked as a detective in February and March of 2001, and his department employed the victim as a confidential informant. During the course of his investigations, the victim and Defendant Allen contacted each other multiple times. As a result of these contacts, the grand jury indicted Defendant Allen, and the victim was listed as a witness against Defendant Allen. Detective Davidson unsuccessfully attempted to locate the victim in June 2003, which resulted in a dismissal of the case against Defendant Allen. On cross-examination, Detective Davidson agreed that the victim was a witness against approximately forty defendants as a result of his investigation. After the victim disappeared, all of the cases were dismissed. The detective testified that both the victim and the victim's wife were paid confidential informants. The victim's wife died on March 15, 2004, before she could testify in any of the cases.

Kathy Mullins, the Circuit Court Clerk for Hamblen County, testified that case number 03-CD-046, in which Defendant Allen was the Defendant, listed the victim as a witness, and the case was dismissed on July 18, 2003.

Richard Turner, the custodian of the telephone records for Bellsouth, identified a phone number listed in the victim's name and stated that the address associated with the number was in Morristown, Tennessee. More specifically, Turner testified about a three-minute call made from the victim's phone to another number, 423-312-3439, at 6:48 a.m. On June 26, 2003, the victim's phone received a call, one minute in duration, from the 3439 number at 6:52 a.m.

The State called several employees from the motels involved in this investigation. Lynne Killian, record keeper for the Super 8 Motel located on East Andrew Johnson Highway, testified that a "George Smith," who listed his address as in Morristown, checked into the motel sometime after midnight on June 26, 2003. Mike Patel, an employee of the Crown Inn at Exit 4 in White Pine, said that a person by the name of "James A. Jones" registered at the motel on June 28. On July 11, a person named "Clyde Capps" checked in using the license of "Patty Diamond." Dorris Taylor, a Hillcrest Inn employee in June of 2003, said that, on June 25, 2003, Defendant Smith filled out a registration card and was assigned room 227. He provided his address as 99 Pine Cone Drive, Whitesburg, Tennessee. On June 26, 2003, a "Lee Smith" checked in, and she assigned him room 227. He checked out on June 27, 2003. Taylor identified another registration card filled out by "Lynn Atkins" on June 25, 2003, which listed her address 1995 Liberty Hill, Lot number 21, Morristown, Tennessee. She was assigned room 209. Taylor noted that both Smith and Atkins were registered on June 25, 2003. On cross-examination, Taylor testified that there were ten rooms registered that evening, and she had no way of knowing how many people stayed in each of the rooms.

Robert Dwayne Rucker testified he was incarcerated for his prior convictions for forgery, theft, and the sale of cocaine. In June 2003, Defendant Allen approached him, and the two discussed that Defendant Allen wanted to pay twenty thousand dollars to have the victim killed. According to Rucker, Defendant Allen wanted the victim killed for being an informant and because he "had him on an indictment and [Defendant Allen] didn't want to go back to prison. He was out on parole." Rucker said that Defendant Allen was supposed to contact him about killing the

victim, but never did. In July 2003, Rucker saw Defendant Allen, who said that his lawyer got the charges against the Defendant dropped. When Rucker inquired further, Defendant Allen said that he "took care of the problem," which Rucker took to mean that he had "taken care of" the victim. Rucker testified that he worked with the Tennessee Highway Patrol ("THP") during the time of these events as an agent.

On cross-examination, Rucker testified he worked for the THP since the end of 2002, and THP paid him cash for his services. Rucker agreed that he failed to report to the IRS his THP income and his income from a construction job. Rucker said that, immediately after Defendant Allen asked him to kill the victim, he informed the THP of this, and he made this report before the victim's disappearance. Rucker said that he knew of the victim, but chose not to approach the victim with this information because he did not know the victim "that well" and did not know where the victim lived.

Phyllis West testified that she had previously been convicted of theft of property over $500 and received a four-year sentence. She said that Danielle "Sissy" Epps introduced her to Defendants Smith and Jarnigan on June 21, 2003, at Defendant Smith's sister's house. On June 22, 2003, when West was riding in a car with Epps and Defendant Smith, she overheard Defendant Smith tell Epps that he wanted Epps to help him kill the victim. Defendant Smith said that he wanted Epps to "lure [the victim] out." West drove to where the victim lived, and Epps went inside the house and got the victim to agree to let her come back and talk to him.

West testified that, the following day, Epps picked up West and Defendant Smith, and West rented a motel room in Morristown, where Defendant Allen brought her a tape recorder and some crack cocaine. Defendant Allen instructed Epps to visit the victim and try to get him high and tape record him. West said that Epps left the motel room and returned later with the tape recorder. Although she could not recall the exact date, West testified about a time when she was at Defendant Smith's house and saw Defendant Allen driving his blue Cadillac. She said she was talking to Defendant Smith at an abandoned factory, when he had to meet someone to pick up some money. West saw a blue Cadillac pull into the driveway. The following day, Defendant Smith bought an old white Mercedes.

-12-

West said that, on Tuesday, June 24, 2003, she and Epps went to the Days Inn Motel, and Epps paid for their room. The following day, she and Epps got a room at the Hillcrest Inn in White Pine. Later, Epps picked up Defendants Smith and Jarnigan, who rented a separate room at the same motel. Defendant Allen and a man named Darrell came to the room later with a black pistol. On the morning of June 26, when West arrived back at the motel to get some of her things, Defendant Smith told her that she could not get her things because the victim was on his way to the motel. West testified that, later, on June 28, 2003, Defendant Smith told West that he was "sorry but he had to do it," and she asked, "What?" Defendant Smith responded, "We were in the woods but he didn't feel a thing, he was high."

On cross-examination, West agreed that she smoked crack cocaine three to four times per day each day during this time period. She admitted arrests in August of 2003 for violating her probation and for theft of property valued over $500 and explained that these charges were related to her drug use.

Danielle Lynne Epps testified that the State charged her in this case with first degree murder, alleging that she aided and abetted the Defendants in committing the victim's murder. She testified she had reached a plea agreement with the State whereby she would plead guilty to attempt to facilitate first degree murder and testify truthfully at the Defendants' trial in exchange for the State's recommendation of an eight-year probationary sentence.

Epps described Defendant Allen as her friend, and said Defendant Allen introduced her to Defendant Smith at the College Square Apartments in Morristown. He told her at the time of the introduction that Defendant Smith "was the one that was going to take [the victim] out." Epps recalled another time when she heard West and Defendant Smith discuss that Defendant Smith would kill the victim.

Epps said that, on June 24, 2003, she stayed at the Super 8 Motel with Defendant Smith and West. Defendant Allen made the statement that whoever "got" the victim first would get paid, but he did not disclose the amount. Defendant Smith said that he was either going to shoot the victim or get him "messed up on drugs." Epps left and went to a friend's house where she used the phone to page Defendant Allen. She asked Defendant Allen if she could go to his house to purchase some drugs. He said to call

-13-

him back later because he just gave all of his drugs to Defendant Jarnigan. Defendant Allen said that Defendant Jarnigan took the drugs and asked for some rubber gloves and a piece of plastic or paper, and told him that they getting ready to "do" the victim.

Epps testified that she met Defendant Allen to purchase drugs, and he handed her more drugs than she purchased and told her to drop them off with Defendant Smith at the motel. Epps testified that, when she dropped off the drugs, she said to the victim, "If you love your children you'll go home," and the victim said "Well, I'm sitting here partying right now." As she was leaving, she saw Defendant Jarnigan.

Epps said that she and her friend went back to her friend's house, where she called Defendant Smith's room and asked to speak with the victim. She asked the victim again to go home and told him that she would take him home. He told her "no" because he was "partying" and hung up the phone. She said that, at the time, she knew what was going to happen to the victim, but she did not say anything because Both Defendants Smith and Allen had threatened to "take [ ]" her "out" if she crossed them.

Connie D. Lawson, Defendant Smith's sister, testified that she grew up with Defendant Allen. She also knew Defendant Jarnigan as her brother's girlfriend. Lawson testified that, in 2003, both Defendant Jarnigan and Smith lived with her. While they lived with her, she saw Defendant Smith with a black pistol wrapped in a white towel. She said that the pistol was loaded with a clip, had a laser, and she saw Defendant Smith fire the pistol while he was at her house.

Lawson testified that, on June 26, 2003, she saw Defendant Jarnigan when she picked her up at the Hillcrest Inn and took her to the Family Dollar, where Defendant Jarnigan purchased some clothing. When she picked her up, she saw Defendant Smith and the victim in the same motel room. After she and Defendant Jarnigan returned from shopping, and while Lawson was leaving, she saw the victim, Defendant Smith, and Defendant Jarnigan all walking from the motel room toward a wooded area in the back.

Lawson testified that later that evening she saw Defendant Smith at their mother's house, and he asked her to give him a ride. She gave a ride to Defendant Smith, Defendant Jarnigan, and a little red haired boy, taking them to the boy's house. Lawson then dropped Defendants Smith and

Jarnigan at the Super 8 Motel. The next day, she saw Defendants Smith and Jarnigan wearing the clothes that Defendant Jarnigan purchased the previous day. Defendant Jarnigan had with her two blue Food City bags, both tied at the top. Lawson testified that she saw the two Defendants again the following day at her house, and they no longer had the blue bags.

Lawson testified that she talked with Defendant Smith while they were at her house and that Defendant Smith was crying "really hard." He told her that he had shot the victim in the back of the head. Defendant Jarnigan, who was also in the room, said, "We killed him execution style." Lawson said that the Defendant told her that he was urinating in the woods and turned around and shot the victim in the back of the head. Later, Defendant Smith also told Lawson that the victim's hair flew into Defendant Smith's mouth when he shot him. Defendant Smith also told her that he had moved the victim's body and that it looked like dogs had been eating the body.

Lawson testified that, a few weeks later, she gave Defendant Jarnigan a ride to the Roe Junction community. On the way back, Defendant Jarnigan indicated a spot where the Defendants had thrown "evidence out." Lawson said that she told Defendant Jarnigan that she was crazy, and Defendant Jarnigan said, "Yes, I am crazy[,] and I've got papers from Lakeshore and I can get away with anything."

Lawson said that, sometime later, she and Defendant Smith got into an argument. Her brother said that "he could get fifty years or life" because Lawson "knew too much."

On cross-examination, Lawson testified that she refused to speak with the Defendants' lawyers in preparation for this case because she had been threatened and did not know who to trust. Lawson conceded that the State's attorney told her not to speak with the Defendants' attorneys. Lawson agreed that she had previously been convicted in 1999 of misdemeanor forgery and in 2002 of criminal impersonation. She said that she violated her probation for criminal impersonation and had to serve three months in jail. Lawson said that she did not call the police after her brother and Defendant Jarnigan confessed because she did not believe what he said.

Michael Lynn Brassfield, Defendant Allen's brother, testified that he knew Defendants Smith and Jarnigan. At the time of trial, Brassfield

testified he was serving a sentence for breaking and entering and that the State's attorney visited him in jail. Brassfield testified that the State made an agreement with him whereby he pled guilty to accessory after the fact of first degree murder in exchange for a one-year sentence that would run concurrently with his current sentence.

Brassfield testified about the events surrounding this case and said that he went to the Super 8 Motel in Morristown where he saw Defendants Allen and Smith, Richard Atkins, and a girl named "Sissy." While in the motel room, Defendant Allen mentioned two "Mexicans [who] had twenty-five thousand dollars on [the victim's] head." Brassfield recalled another incident around the same period of time when he was at a Days Inn in White Pine with Defendants Allen and Smith, West, and "Sissy." While there, Defendant Allen asked Brassfield and Defendant Smith to go to the bathroom with them, and he mentioned again about the two Mexicans who offered money in exchange for killing the victim. Defendant Allen said that, if someone killed the victim, he would ensure they were paid. Defendant Allen said that he wanted the victim killed because the victim "had indictments on him." Brassfield agreed to kill the victim but could not get him off the hill.

After Brassfield told Defendant Allen that he could not get the victim off the hill, Defendant Smith agreed that he would kill the victim. Brassfield then asked Defendant Allen to walk outside with him, where he told Defendant Allen that if Defendant Smith could get the victim off the hill then Brassfield would kill the victim. Sometime later, at Defendant Allen's apartment, Defendant Allen told Brassfield that he could not get anyone to kill the victim, and he was going to have to take his case to trial. A day or so later, Brassfield brought up the victim's name, and Defendant Allen told him that he had heard that the victim was "laying [sic] in White Pine with a hole in his head."

Brassfield testified that, about four days after the motel meeting, Defendant Allen told him that he was giving Defendant Smith drugs, and Defendant Smith and the victim were probably doing the drugs together. Defendant Allen was not sure whether the victim was dead, so he wanted Brassfield to go and to see the victim's body. Brassfield went to the motel, and Defendant Smith told him that he would show Brassfield the body. Brassfield said that he did not want to see it, in part because the victim had been missing for four days, and Brassfield was sure that Defendant Smith

-16-

had killed the victim. Brassfield waited at the motel for a while, and then he left with his girlfriend, Cynthia Renee. Renee told him something that indicated that she knew about the murder. Brassfield went back to the motel to confront Defendant Smith about telling Renee about the murder. Defendant Smith then asked what he needed to do, and Brassfield said that they would have to move the body so that Renee would not know its location.

Brassfield said that he and Renee purchased a shovel and then returned to the motel. Then he and Defendant Smith retrieved the victim's body, which was behind the Hillcrest Inn. They put the body in Renee's truck, and then threw it into a hayfield on River Road. Brassfield said that he owed Defendant Allen $600, and Defendant Allen forgave the debt in exchange for Brassfield's actions. Further, Defendant Allen provided Brassfield drugs "about every day." Brassfield said Defendant Allen also gave him eight thousand dollars and two ounces of dope, with instructions to give it to Defendant Smith at the Crown Inn. Brassfield brought Defendant Smith the money and drugs, worth a total of ten thousand dollars, and told Defendant Smith that Defendant Allen would get the rest of "it" to him next week. Defendant Allen contacted him a week later and told him to take Defendant Smith another eight thousand dollars and two ounces of drugs, which Brassfield did. Brassfield told Defendant Smith that Defendant Allen said that they were "even."

Brassfield testified that he told Defendant Allen that he had buried the body, which was a lie. Brassfield said that, since the time of these events, he and Defendant Allen had argued and the Defendant hit him with a "ball bat." Brassfield said that he had been incarcerated since that night. After he was incarcerated, he began to fear for his girlfriend Renee and her children. In an attempt to get Renee taken into protective custody, he showed law enforcement where he had put the body.

On cross-examination, Brassfield agreed that, in accordance with his deal with the State, he would serve no additional jail time to his sentence for aggravated burglary. Brassfield testified that he was not present when the victim was killed. Brassfield said he did not mention that Defendant Smith helped him move the body when he first spoke to law enforcement but told them that another man helped him. Brassfield agreed that he omitted from his original statement mention that he gave Defendant Smith $16,000 and eight ounces of drugs from Defendant Allen. He explained this omission

-17-

by stating that he did not want his brother, Defendant Allen, involved. Brassfield testified that he had had a life-long struggle with drug addiction and that he has used a lot of crack cocaine. Brassfield said that, around the time of this killing, he used drugs every day all day even though he was on probation. Brassfield said that he was afraid of the victim. Brassfield denied that his girlfriend was with him when he moved the victim's body but said that she was with him when he washed out the truck. Brassfield testified that Defendant Allen told him that Defendant Allen had to "pull a gun" on Defendant Smith because Defendant Smith kept asking for more money for killing the victim.

Chad Mullins, a sergeant with the Hamblen County Sheriff's Department, testified that he received a message in August 2003 from Brassfield. Brassfield told Sergeant Mullins that, if the sergeant kept Brassfield's family safe, he would take the sergeant to the victim's body. A few days later, Brassfield took him to the body. Sergeant Mullins agreed that Brassfield told him that "another man" helped Brassfield move the body, and Brassfield did not mention Defendant Smith.

Tim Johnson testified that he was, at the time of trial, incarcerated in the Hancock County Jail, and he was previously incarcerated in the Jefferson County Jail. The State's attorney met with Johnson in jail, and they agreed that, if Johnson helped the State's attorney with this case, the State's attorney would tell the Jefferson County Prosecutor that Johnson had done so. Johnson recalled that, around the second week of July 2003, he rented a room at the Crown Inn and registered it in his mother's name, Patty Diamond. He said that, at the motel, he saw Defendant Smith smoking crack and heard him say that he had to kill the victim. Defendant Smith told Johnson that he shot the victim once in the back of the head, and indicated that he got $10,000 to do the job. Defendant Smith pointed to the water tower behind the Crown Inn and said that the body was lying over there. Defendant Smith told him that the victim's skull was gone and maggots were crawling out of it. Defendant Smith then offered Johnson $5,000 to burn the body and bring Defendant Smith the head. Johnson saw that Defendant Smith had a large "wad" of money. On cross-examination, Johnson agreed that he gave a statement to Agent Smith, in which he did not mention that he was offered $5,000 to burn the victim's body.

Kristopher Jarnigan testified that he is Defendant Jarnigan's brother, and he knew Defendant Smith. He said that, in the summer of 2003,

Defendant Jarnigan contacted him trying to obtain a gun. She also asked Jarnigan's father and brother for a gun. Jarnigan testified that, around that time, he took Defendant Smith to Defendant Allen's house in Morristown to get crack cocaine that Defendant Allen was paying Defendant Smith for the victim's murder. Defendant Smith told Jarnigan that he shot the victim in the back of the head for $10,000. On cross-examination, Jarnigan said that he faces prescription fraud and an aggravated robbery charge. He hoped testifying would cause the State to drop the charge.

John Stacy Lovell testified that, in December of 2003 and January of 2004, he was employed at a Shell station. He said that he has known Defendant Smith all his life and that Defendant Smith came into the Shell station where he worked, and the two were joking with each other. Lovell said that Defendant Smith went from being happy to being sad and told Lovell that he had to tell Lovell something. Defendant Smith reached up and whispered in Lovell's ear that he killed the victim. Lovell then played a video surveillance tape from the evening when Defendant Smith came into the Shell station that showed Defendant Smith leaning over the counter towards him. On cross-examination, Lovell agreed that Defendant Smith appeared intoxicated. He also agreed that he told the Defendant that he did not blame him and that he loved him. He said that Defendant Smith said that he killed the victim because he snitched "out Stanley Davis and his old lady." Lovell agreed that Defendant Smith never mentioned Defendant Jarnigan.

Rick Harmon, a detective with the Hamblen-Morristown Multiple Crimes Unit, testified that he brought a metal detector to the vicinity of the Hillcrest Inn and searched for a shell casing. There, he found a bullet that he gave to Agent Smith. Detective Harmon also found a spent casing from a gun that had been fired off the North side of the front porch at 611 King Avenue. Detective Harmon searched the location where the victim's body was found and the location where the police determined the victim had been shot. He found another shell casing several feet from where he was told that the victim fell when he was shot. He contacted Agent Smith, who actually retrieved the casing.

Dan Cox, a lieutenant with the Morristown Police Department, testified that he went to the Roe Junction area to look for the weapon involved in this case. He found a weapon in a creek.

Don Carmon, a special agent with the TBI, testified that he received in this case the bullet from the crime scene and a pistol. Agent Carmon determined that the bullet recovered had the same rifling profile as the pistol that he examined. He could not, however, determine anything by comparing a bullet that he fired from the pistol with the bullet submitted because the barrel of the pistol was corroded. Therefore, he could not be sure that the bullet was fired from the pistol. Agent Carmon testified that he did, however, determine that the two shell casings in this case, one found at 611 King Avenue and the other from the crime scene, were fired by the same pistol. He again could not be sure whether that pistol was the pistol submitted in this case.

Dr. Lea M. Jantz, a forensic anthropologist with the University of Tennessee, testified that she assisted in recovering and analyzing the human remains in this case. She and her team located remains at the site and flagged them. They found a skull, hand bones, rib, and some vertebrae. Dr. Jantz said that, from the bones, she determined that animals had access to these remains and probably were the cause of the large scattering of this site and these remains. Dr. Jantz also examined the place where the victim was shot. She said that the body appeared to have decomposed primarily at that site. Dr. Jantz's team estimated that the remains belonged to a white male between the ages of twenty-five and thirty-five. He had limited dental work and suffered anti-mortem trauma. The doctor took a small section of bone for DNA testing.

Brent Murphy, a crime scene investigator with the Morristown City Police Department in August 2003, testified that he helped recover bones where the victim's remains were found. He said that he also recovered a pair of bloody blue jeans and retrieved a bone from one of the pant legs. He packaged the bone and blue jeans and sent them to the TBI.

Donna Purkey, the victim's older sister, testified that she gave Agent Smith a blood sample to compare DNA between her brother and the remains, for identification purposes.

Chad D. Johnson, a special agent forensic scientist with the TBI, testified that he conducted tests on the bone that was sent to him from the Morristown Police Department and on the blood sample submitted by the victim's sister. He determined that the bone needed mitochondrial DNA

testing, and he sent the bone and the blood to ReliaGene Laboratory for testing.

Gina Pineda from ReliaGene Technologies testified that her laboratory obtained a DNA profile from both the bone and the blood sample in this case. The bone in this case produced a mitochondrial profile consistent with the victim's sister's profile.

Defendant Allen called to testify Stephanie Schaeffer, who testified that she knew Phyllis West well, as the two had been incarcerated together for about ten months. Schaeffer said that West discussed with her frequently the victim's murder but never mentioned Defendant Allen's name. Schaeffer stated that she dated Brassfield for approximately two and a half or three years, but they broke up before the victim's death. Schaeffer testified that Brassfield has a reputation as an untruthful person in the community.

Bronson Hollifield testified that he has known Defendant Allen for approximately six or seven years, and, previously, he worked for the Defendant's concrete business. Hollifield said he was present at the market when Defendant Allen saw Rucker, and Defendant Allen did not solicit anyone to kill the victim.

Based upon this evidence, the jury convicted each Defendant of one count of first degree premeditated murder.

*Id*. at *1-15.

*Post-conviction hearing*

Petitioner's mother, Artherine Clark, testified that sometime in June, Petitioner came to her "completely drunk" and told her that he had killed the victim and that it was an accident. Ms. Clark testified that Petitioner did not tell her anything else about the killing except that the gun had "a trigger defect or something." She testified that Petitioner was "completely wasted" and crying, and he left her house immediately after he told her. When interviewed by detectives, she told them that Petitioner told her he killed the victim and that it was an accident. She spoke to Petitioner's trial counsel on two occasions for "about fifteen minutes each time." She testified that she was asked to testify on Petitioner's behalf at trial, but she was never called as a witness.

Connie Lawson Musick, Petitioner's sister, testified that she was called as a witness at trial by the State to testify against Petitioner. She testified that the State's attorney instructed her not to speak with Petitioner's trial counsel. On cross-examination, Ms. Musick admitted that she had recently pled guilty to felony drug offenses.

Petitioner's trial counsel testified that he was appointed to represent Petitioner at trial. According to trial counsel's claim for attorney's fees, he spent 27.5 "in-court" hours and 69.6 "out-of-court" hours on the case. Trial counsel estimated that he spent "quite a bit" more time on the case than he billed because he did not always write down his time spent working on the case. He testified that he represented two other defendants who were also charged with murder that same year. Trial counsel testified that he "had a hard time getting N.C.I.C." from the State on its witnesses, and he filed a pretrial motion requesting that information. He also "didn't like not being able to talk to [Petitioner's] sister," but that he did not feel the State acted improperly. Trial counsel was never able to speak to Ms. Musick, and he sought to have her testimony excluded at trial on the basis of her "unavailability and refusing to speak to [him]." Trial counsel recalled that, at the time of trial, Ms. Musick did not testify that she was prohibited from talking to him, but rather that she was discouraged from talking to him. Trial counsel never spoke to Ms. Musick before trial because she did not return his phone calls, but he was told by investigators hired by him that she would not speak to him. Trial counsel questioned Ms. Musick about her unwillingness to speak to him during his cross-examination of her and moved the trial court for a mistrial on that basis.

Trial counsel testified that he did not feel the prosecutor's remarks during voir dire that "[w]hat I am trying to get across is that people like ourselves are not going to be in that element" was improper. Trial counsel testified that, although there was evidence that Petitioner was intoxicated on the night of the offense, he did not seek to suppress Petitioner's statements on that basis because Petitioner did not make statements while intoxicated. Trial counsel testified that the jury heard evidence of Petitioner's prior bad acts, and trial counsel chose not to request a jury instruction concerning prior bad acts because "[t]he second you do that they get to hear about the prior bad acts again and again; and the instructions were very clear as to what they could consider and not; and having to repeat it to them, the same acts, three or four times right before they go deliberate, I thought it was a terrible idea." Trial counsel testified that he met with Ms. Clark (Petitioner's mother) "numerous" times, more than the two or three occasions that she testified to.

Prior to trial, trial counsel sought to exclude the transcript and audio recording of a conversation between Petitioner and his co-defendant Jarnigan, or alternatively, to have portions of it redacted. Trial counsel did not believe that Petitioner's statements on the recording were in violation of *Miranda v. Arizona* because Petitioner was not being questioned by police. An officer asked Petitioner, while sitting in the backseat of a police

cruiser, "Tell us the truth, will you tell us what happened?" However, Petitioner's incriminating statements were not made in response to the officer's question, but during a conversation with his co-defendant while the police were executing a search warrant on his residence. Trial counsel testified that Petitioner requested an attorney while sitting in the backseat of the cruiser; however, Petitioner did not make any incriminating statements in response to police questioning.

On cross-examination, trial counsel testified that the evidence against Petitioner at trial was overwhelming, and that "the issue was whether or not it was intentional or an accident." The evidence at trial included a videotape of Petitioner demonstrating to investigators how he killed the victim. The videotape was recorded at the location of the shooting.

Petitioner testified that trial counsel was ineffective for failing to suppress the audiotape taken of him in the backseat of the patrol car while the officers were executing a search warrant. Petitioner testified that, at some point, an officer opened the car door and asked him a question. Petitioner requested a lawyer, and the officer closed the door. Petitioner did not answer the officer's question. Petitioner testified that he discussed with trial counsel about calling Petitioner's mother as a witness, and trial counsel told Petitioner that "[n]obody would believe her." Petitioner also testified that trial counsel should have called his stepfather as a witness, who would have testified that Petitioner accidentally killed the victim. Petitioner and trial counsel discussed Petitioner's defense theory that the shooting was an accident and that Ms. Musick's testimony would support that. Petitioner testified that there was "a lot more that he could have done that he didn't." Petitioner testified that trial counsel should have asserted intoxication as a defense or, at least, challenged the admissibility of his statements on that basis. Petitioner testified that trial counsel should have requested a jury instruction that he could not be convicted solely on the testimony of accomplices. Finally, Petitioner testified that the prosecutor made improper comments during closing argument in that he implied that it was the jury's duty to convict Petitioner. Petitioner testified that trial counsel was ineffective for failing to object to the prosecutor's statements. Reading directly from the trial transcript, Petitioner testified that he believed the following comments made by the prosecutor were improper:

> Thank you, your Honor, thank you, all, for taking out of your everyday lives to come here and be citizen judges and to make sure that we have justice in our county. This is probably the most important case that any of us will ever be involved with, it will affect our country – our county for many, many years. Do we believe that? We don't believe that, that's not true. He accepted a contract to kill Mr. Wilder, blew his head off, he was an undercover agent for the Morristown City Police and Sheriff's Department

-23-

Multiples Crime Unit who had an indictment on Nat Allen, and he was killed because of that so he would not testify. I mention this to you that this is an important case. Now, we don't have a community where witnesses are killed, we didn't have one. For this system here to operate, we cannot have that kind of community. We had witnesses come in here and testify to you that they knew were afraid, who had been threatened but nonetheless they came in here and told you the truth. You know they told you the truth because they told bad stuff on themselves. They were ripped apart because of the stuff that they told. For justice – Going on down to the last paragraph: If our system of justice is going to continue here in this community to be great as it is and as strong as it is, these individuals need to go to prison for the rest of their lives.

Petitioner also complained of the following remarks by the prosecutor:

Yes, they [the State's witnesses] have criminal records; yes, they are cocaine addicts, drug addicts. If they wasn't [sic] those type of people they wouldn't have been associated with the defendants. I mean, you know – the State didn't bring these witnesses to you today; these three defendants did. Ladies and gentlemen, when you are casting a play in hell, you don't find angels that play the part.

*Analysis*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient

performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580.

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id*. at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . .; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id*. However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A.     Motion to Suppress

First, Petitioner asserts that trial counsel was ineffective for failing to file a pretrial motion to suppress Petitioner's statements made during a conversation with his co-defendant while in the backseat of a patrol car. Petitioner contends that the statements should have been suppressed because he was not given his *Miranda* warnings and that the conversation was recorded without his knowledge.

During the investigation of the murder of the victim, Don Wilder, police obtained and executed a search warrant of Petitioner's and co-defendant Jarnigan's residence. During the search, Agent Smith placed Petitioner and Jarnigan in the backseat of a police car with a recording device. *State v. Smith*, 2007 WL 4117603, at *3. At the post-conviction hearing, Petitioner's trial counsel testified that he sought to suppress the audio recording, or portions thereof, on the basis of Tennessee Rules of Evidence 401, 403, and 404(b), and he was successful in having portions of the statement redacted. In the direct appeal of this case, this

Court reviewed Petitioner's challenge to the evidence on the basis of relevance and concluded as follows:

> The evidence, however, was properly admissible for a purpose other than to prove the character of a person or to show action in conformity with the character trait. The tape recorded conversation was offered to prove knowledge of Defendants Jarnigan and Smith about the murder and to complete the story of the crime. Clearly, both Defendants participated in the conversation, and they discussed things that clearly prove guilty knowledge such as: (1) whether the search was for evidence of drugs or a homicide; (2) how the police would not find bloody clothing or shoes to tie them to the homicide; (3) that Defendant Smith would take responsibility for any charges if Defendant Jarnigan was also charged; (4) that they should "stick to the story"; (5) that Defendant Jarnigan should not be concerned with the "dope" but should be concerned about the victim. The conversation also helped complete the story of this crime in that it showed knowledge of Defendant Jarnigan about these events. It further completed the story in that it provided evidence that Defendant Smith asked Defendant Jarnigan to bail him out of jail if he was arrested and that, if she did so, he was "gone." Finally, we conclude that this evidence was relevant and that its probative value was not outweighed by the danger of unfair prejudice. Accordingly, the Defendants are not entitled to relief on this issue.

*State v. Smith*, 2007 WL 4117603, at *32.

At the post-conviction hearing, trial counsel testified that he did not attempt to suppress the statement on the basis of *Miranda v. Arizona* because the statements were not made in response to any questioning by law enforcement. Trial counsel testified that Petitioner was not questioned by police while inside the patrol car, but that it was his conversation with his co-defendant, when police were not present, that was incriminating. Trial counsel later testified that police officers did, in fact, attempt to question Petitioner. He stated:

> Q:    In your review of the file, in your view of the record, was there any interrogation going on?
>
> A:    No. There was an attempt to [sic] interrogation, yes.
>
> Q:    Okay.

-26-

A: There is no doubt about that; they asked, ["]Tell us the truth, will you tell us what happened?["]

Q: And then they closed the door?

A: That's right.

Q: And so, therefore, after the questions was [sic] asked and there was a tape-recording in there, that's when [Petitioner] said what – actually, was the preface of the entire case, so to speak; it led them to the next step in their investigation.

A: I didn't inquire from the police officers what led them where. They did say some very damning stuff in the back of it but the police officers were not present. They were not responding to any questions asked of them by a police officer.

In *Miranda v. Arizona*, the United States Supreme Court held that the prosecution cannot admit a statement by the defendant stemming from custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* It is clear from the record that Petitioner's incriminating statements were not made in response to questioning by police. Therefore, Petitioner has not shown that counsel was deficient by failing to seek suppression of the statement on that basis.

With respect to the recording by police officers of Petitioner's conversation with his co-defendant, we conclude that Petitioner has not shown that he would have prevailed had counsel sought to suppress the statement on the basis that it violated Petitioner's Fourth Amendment right to privacy. This Court has consistently held that "people in the backseat of a police cruiser do not have an objectively reasonable expectation of privacy." *State v. Gosnell*, 62 S.W.3d 740, 747 (Tenn. Crim. App. 2001), citing *State v. Morgan*, 929 S.W.2d 380, 384 (Tenn. Crim. App. 1996). Petitioner is not entitled to relief on this issue.

B. Forfeiture by Wrongdoing

Next, Petitioner asserts that trial counsel was ineffective for failing to argue the "Doctrine of Forfeiture by Wrongdoing" in order to refute the State's theory on motive. At the post-conviction hearing, Petitioner testified, "it would have showed [sic] the jury that the

-27-

State saying that me killing Mr. Wilder, it would have been a motive because Mr. Allen would have already – he would have got convicted, anyway." In its order denying post-conviction relief, the court found that "Petitioner could not articulate what he meant concerning this issue other [than] that his lawyer should have argued forfeiture by wrongdoing."

An exception to hearsay, the doctrine of "forfeiture by wrongdoing" allows the admission of a statement "against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." Tenn. R. Evid. 804(b)(6). Apparently, Petitioner's argument is that the State's alleged motive at trial, that Petitioner was hired by Mr. Allen to kill the victim, Mr. Wilder, because Mr. Wilder was expected to testify in another unrelated case against Mr. Allen, would have been refuted by his counsel asserting the forfeiture by wrongdoing exception to hearsay. We agree with the State that Petitioner's argument is misplaced. This exception to the hearsay rule may have been applicable in the State's prosecution of Mr. Allen in an unrelated drug case; however, Petitioner has not shown how his trial counsel's failure to argue forfeiture of wrongdoing would have resulted in a different outcome in Petitioner's case or that it would have been useful in allowing any hearsay statements to be admitted. We conclude that Petitioner has failed to prove both deficiency and prejudice; and therefore, Petitioner is not entitled to relief on this issue.

C.     Failure to call witnesses

Petitioner asserts that trial counsel was ineffective for failing to call his mother and stepfather as witnesses at trial. He contends that their testimony would have established that he was intoxicated on the night of the murder and that the killing was an accident.

Petitioner did not call his stepfather as a witness at the post-conviction hearing. It is well-established that if a "petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the [post-conviction] evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As a general rule, this is the only way the petitioner can establish that (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness or call the witness to the stand resulted in the denial of critical evidence which caused the petitioner prejudice. *Id.* Neither the trial court nor this Court can speculate on what a witness' testimony might have been if introduced by counsel. *Id.*

Petitioner's mother did, however, testify at the post-conviction hearing. She testified that Petitioner was intoxicated and told her that he had killed the victim by accident and that the gun had a trigger defect. She learned that the victim had died about two weeks later. When detectives subsequently interviewed her, she told them what Petitioner had told her. She also told Petitioner's trial counsel. Trial counsel testified that he met with Petitioner's mother prior to trial on "numerous occasions," but he did not recall her ever telling him "anything about" what she testified to at the post-conviction hearing. Petitioner testified that trial counsel told him that his mother would not be called as a witness because the jury would not have believed her. In its order denying post-conviction relief, the trial court found:

> If Ms. Clark had been called as a witness then she would have a difficult time explaining that she knew about the killing and did not report it. Ms[.] Clark testified she learned the victim was deceased two weeks later. The Court finds that the issue of whether [trial counsel] should have called petitioner's mother, and stepfather, who had a criminal record was a tactical decision.

The trial court apparently credited trial counsel's testimony over Ms. Clark's testimony. Questions concerning the "credibility of the witnesses, the weight and value of the evidence, and resolutions of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Although Ms. Clark testified at the post-conviction hearing that she told trial counsel that Petitioner had shown up at her home, "completely drunk," on the night of the murder and told her that he shot and killed the victim and that it was an accident, she did not report it to anyone until questioned later by investigators. Trial counsel testified that he met with Petitioner's mother on several occasions, and she did not mention that to him. Moreover, we conclude that the evidence does not preponderate against the trial court's finding that trial counsel's decision not to call Petitioner's mother as a witness was a tactical decision. Trial counsel made a determination, after adequate preparation, that whatever relevant and probative testimony Ms. Clark may have provided would have been discredited by the jury because she is Petitioner's mother. Petitioner is not entitled to relief on this issue.

D.    Failure to strike testimony of Connie Lawson Musick

Petitioner contends that trial counsel was ineffective for failing to move to strike the testimony of Connie Musick, Petitioner's sister, based on the State allegedly having prohibited Ms. Musick from speaking to trial counsel prior to trial. Trial counsel testified at the post-conviction hearing that he personally attempted to contact Ms. Musick "once or twice" prior to trial; that he "never spoke to her at all"; that an investigator hired by him made "several attempts" to contact Ms. Musick, and those attempts were also unsuccessful;

-29-

and that trial counsel "tried to have her testimony excluded at trial" on the basis of "her unavailability and refusing to speak to [him]." Trial counsel did not raise the issue in the direct appeal from Petitioner's convictions because, he testified, Ms. Musick's testimony at trial "was not as strong as what it was" at the post-conviction hearing and that she had not testified at trial that she was "prohibited" from speaking with trial counsel, but that prosecutors told her that she was not compelled to speak to him.

In its order, the post-conviction court concluded as follows:

> Given Ms. Lawson [Musick]'s inconsistent explanations as to why she did not permit pretrial interviews, the Court finds that Petitioner has failed to carry his burden of proving by clear and convincing evidence that the state of Tennessee prohibited Ms. Lawson from giving pretrial interviews and that [trial counsel] should have raised the issue on his motion for new trial and appeal.

First, we note that Petitioner cannot complain that trial counsel failed to have Ms. Musick's testimony excluded because trial counsel did, in fact, seek to exclude her testimony. Counsel cannot be found deficient solely for receiving an unfavorable ruling. Second, trial counsel explained his failure to raise this issue in Petitioner's motion for new trial and on direct appeal because Ms. Musick's trial testimony, concerning her unwillingness to speak to counsel prior to trial, was not as strong as her post-conviction hearing testimony. As summarized in this Court's opinion above, Ms. Musick "testified that she refused to speak with the Defendant's lawyers in preparation for his case because she had been threatened and did not know who to trust. [She] conceded that the State's attorney told her not to speak with the Defendants' attorneys." *State v. Smith*, 2007 WL 4117603, at *11. We agree with the post-conviction court's conclusion that Ms. Musick's explanations are inconsistent. Furthermore, Petitioner has failed to establish that had the trial court stricken Ms. Musick's testimony at trial, it would have resulted in a different outcome. The strength of the State's case against Petitioner did not rest on Ms. Musick's testimony alone. Most of the incriminating evidence came from Petitioner's statements and admissions to police and from other witnesses. Therefore, Petitioner has not established prejudice. Petitioner is not entitled to relief on this issue.

E.    Accomplice testimony jury instruction

Next, Petitioner asserts that trial counsel was ineffective for failing to request a jury instruction concerning the rule of corroboration of accomplice testimony. The State responds that the record is incomplete, *see* Tenn. R. App. P. 24(b), because it does not include the jury charge at trial. However, Defendant properly supplemented the record on appeal, and the

record shows that the trial court did not charge the jury regarding corroboration of accomplice testimony. Furthermore, it appears from the record that trial counsel did not request the instruction. Therefore, we will address the issue on the merits.

In its order denying relief, the post-conviction court found that the trial court "correctly charged the jury as to the law in the case. The petitioner was not convicted solely on the testimony of accomplices. The petitioner gave a detailed statement to T.B.I. Agent Chad Smith on August 20, 2003. . . ."

Regarding the rule of corroboration, our Supreme Court has stated:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

*Sherrill v. State*, 204 Tenn. 427, 321 S.W.2d 811, 815 (1959). "In short, the evidence must confirm in some manner that (a) a crime has been committed and (b) the accused committed the crime." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997).

Petitioner acknowledges that neither he nor any of his co-defendants testified at trial; however, Petitioner asserts, his co-defendants gave incriminating statements that were admitted at trial. Petitioner also asserts that the trial court should have instructed the jury on corroboration of accomplice testimony in light of the testimony of Danielle Epps, Michael Brassfield, and Tim Johnson, who were also charged with crimes stemming from the same incident and who gave damaging testimony against Petitioner at trial. We agree with Petitioner that the trial court should have instructed the jury on corroboration of accomplice testimony and that trial counsel was deficient for failing to request the instruction. Notwithstanding trial counsel's deficient performance for failing to request the instruction, however, Petitioner has failed to show how he was prejudiced as a result of counsel's deficient performance. There was overwhelming corroborating evidence at trial, including Petitioner's own statements that he made in the backseat of the police car and a detailed statement to law enforcement. *State v. Smith*, 2007 WL 4117603, at *4-5. Additionally, law enforcement investigation corroborated Petitioner's confession. *Id*. We conclude that Petitioner cannot show that he was prejudiced by trial counsel's failure to request a jury

instruction on corroboration of accomplice testimony. Petitioner is not entitled to relief on this issue.

F.      Prior bad acts jury instruction

Petitioner asserts that trial counsel was ineffective for failing to request a limiting instruction regarding the prior bad acts that he referred to during his recorded conversation with his co-defendant. It does not appear from the record that the trial court gave the jury a limiting instruction as to its consideration of evidence of Petitioner's prior bad acts.

The evidence at trial showed that the recorded conversation between Petitioner and his co-defendant Jarnigan took place while a search warrant was being executed on Petitioner's home. In the recorded conversation, Petitioner references scales and drugs as being the object of the search warrant. The record on appeal shows that trial counsel sought to exclude those references and other evidence of "drug activity" prior to trial.

Trial counsel testified at the post-conviction hearing that he did not request a limiting instruction from the trial court as to the jury's consideration of the prior bad acts because,

> the second you do that they get to hear about the prior bad acts again and again; and the instructions were very clear as to what they could consider and not; and having to repeat it to them, the same acts, three or four times right before they go to deliberate, I thought was a terrible idea.

As we have already noted in this opinion, this Court considered in the opinion on direct appeal the admissibility of the tape containing references to drugs and drug paraphernalia and the fact that Petitioner was on parole. *See State v. Smith*, 2007 WL 4117603, at *32. We concluded that the evidence was admissible for a purpose other than to show action in conformity with a character trait, that purpose being Petitioner's guilty knowledge.

The post-conviction court cited this Court's opinion in its order denying relief. Whether counsel should have requested a limiting instruction to the jury, however, is not an issue of admissibility, but rather a question of trial strategy. We have already noted that this Court affords deference to the tactical decisions of trial counsel in reviewing claims of ineffective assistance of counsel. Petitioner is not entitled to the benefit of hindsight. Counsel considered requesting such a jury instruction and determined that the effect of the instruction would have been to cause more negative influence on the jury than had the jury just heard the proof without the instruction. Moreover, Petitioner has not established how he was prejudiced. Petitioner is not entitled to relief on this issue.

G.      Intoxication defense

Petitioner asserts that trial counsel was ineffective for failing to argue or present intoxication as a defense.  We note that Petitioner did not question trial counsel about an intoxication defense at the post-conviction hearing.  Petitioner testified at the hearing that he was intoxicated at the time of the homicide but that trial counsel never inquired, prior to trial, about this intoxication.  Petitioner also testified that trial counsel should have asserted intoxication as a defense.

The State responds that the evidence at trial was sufficient to support the jury's conclusion that the murder was premeditated, and therefore, Petitioner has not shown that he was prejudiced by counsel's alleged deficiency.  In its order denying relief, the post-conviction court found:

> The facts in this case are such that alleging the defense of intoxication would not make any difference.  The petitioner's statement was detailed enough that he explained all the events surrounding the shooting.  He explained exactly what he was thinking about "needing money and not wanting to sell drugs" at the time of the shooting.  After the shooting, he had the ability to remember to retrieve the gun.  All of the foregoing circumstances establish that petitione[r] possessed the required culpable mental state necessary for the offense of first degree murder.  The Court finds that petitioner has failed to carry his burden in establishing intoxication as a defense by clear and convincing evidence.

Evidence of a defendant's intoxication is relevant to negate a culpable mental state of a charged offense.  *See* Tenn. Code Ann. § 39–11–503(a).  While there was evidence at trial that Petitioner had been drinking and using cocaine on the day of the murder, there is no evidence that Petitioner was so intoxicated that he was incapable of forming premeditation.  As we concluded in the direct appeal, there was more than sufficient evidence at trial of premeditation:

> Defendant Smith told police that he accepted money and drugs in exchange for killing the victim.  He was given, and accepted, a pistol to commit this crime.  He discussed plans to kill the victim with multiple people, including the victim's ex-girlfriend, whom he believed could lure the victim out of the victim's house.  Defendant Smith used drugs with the victim, took the victim on a walk, and then, as they were back to back urinating, he turned and shot the victim, who was unarmed, in the back of the head.  Although

Defendant Smith claims that he changed his mind at the last second, but the gun fired anyway, the jury rejected this contention.

*State v. Smith*, 2007 WL 4117603, at *17.

We cannot conclude that counsel was deficient for failing to assert intoxication as a defense. Furthermore, we agree with the State that Petitioner has failed to establish he was prejudiced by counsel's alleged deficiency. Petitioner presented no proof at the post-conviction hearing that would establish that counsel's failure to assert the defense was prejudicial. He and his mother both testified that he was intoxicated, but no other evidence was presented concerning this issue. We cannot say that counsel's failure to pursue intoxication as a defense more probably than not deprived Defendant of a fair trial. *See Tidwell v. State*, 922 S.W.2d 497, 502 (Tenn. 1996). Petitioner is not entitled to relief on this issue.

H.     Improper comments by prosecutor

Petitioner asserts that trial counsel was ineffective for failing to object to statements made by the prosecutor during voir dire and closing argument. He argues that the prosecutor's statements were "an attempt to credulize [sic] the prosecution's witnesses and case while demoralizing and discrediting the defendants."

One of the statements about which Petitioner complains was made by the prosecutor during voir dire, "What I am trying to get across is the people like ourselves are not going to be in that element; that in order for us to get witnesses to the crime we have to go into the element that the defendant is in and get his friends and associates as witnesses." When questioned about the prosecutor's statement, trial counsel testified at the post-conviction hearing, "I don't recall that specifically but I am sure that is correct. Any time informants are used in these cases in about every trial I've had the state has that same paragraph, the statement." Trial counsel testified, "I think he was talking about everyone in general. I didn't think he was trying to put himself in the shoes of the jury, no."

"The ultimate goal of voir dire is to [e]nsure that jurors are competent, unbiased, and impartial." *State v. Cazes*, 875 S.W.2d 253, 262 (Tenn. 1994). Therefore, a trial court "shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges." Tenn. R. Crim. P. 24(b)(1). The State argues that, in the context of the statements, the prosecutor was explaining to the jury that some of the State's witnesses would come from the criminal milieu. The State submits the prosecutor's statements were proper "because the prosecution had to ensure that the potential members of the jury could look past the prior acts of the State's witnesses and

review the evidence fairly." We agree with the State. Trial counsel's failure to object to the statements was not deficient performance. Furthermore, Petitioner presented no proof at the post-conviction hearing that he was prejudiced by counsel's failure to object. Petitioner is not entitled to relief on this claim.

Petitioner also complains of several statements made by the prosecutor during closing argument. Specifically, Petitioner cites, among others, the following statement: "If our system of justice is going to continue to operate here and this community be as great as it is and as strong as it is, these individuals need to go to prison for the rest of their life." However, Petitioner did not question trial counsel about his failure to object to any statements of the prosecutor during closing arguments.

This Court has considered whether trial counsel's failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel. *See Gregory Paul Lance v. State*, No. M2005–01765–CCA–R3–PC, 2006 WL 2380619, at *6 (Tenn. Crim. App., Nashville, Aug. 16, 2006), *perm. to app. denied*, (Tenn., Dec. 18, 2006). In *Lance*, this Court held that:

> [b]ecause the reviewing court must indulge a strong presumption that the conduct falls within the range of reasonable professional assistance and may not second-guess the tactical and strategic choices made by counsel unless those choices were uninformed because of inadequate preparation, it is highly unlikely that [the petitioner will succeed] in meeting either the deficiency or the prejudice prong of the ineffective assistance of counsel claim based on trial counsel's failure to object to the improper closing argument.

*Id*. at *6 (citations omitted); *see Strickland*, 466 U.S. at 690. We recognize that the decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions.

We note that "'prosecutors should exercise extreme caution when making any statement referring to the community interests of the jurors.'" *See State v. Pulliam*, 950 S.W.2d 360, 368 (Tenn. Crim. App. 1996) (quoting *United States v. Solivan*, 937 F.2d 1146, 1154 (6th Cir. 1991)). When a prosecutor has engaged in improper conduct, the test for determining whether there is reversible error is "whether the impropriety 'affected the verdict to the prejudice of the defendant.'" *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994) (quoting *Harrington v. State*, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). In making this determination, we must consider: (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and

the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. *Id*. (citing *State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984); *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

We believe that the prosecutor's statement was improper in that it seems to suggest that the jurors focus on the interests of the community rather than on the defendants' guilt. However, we do not find that the prosecutor's argument caused prejudice to Petitioner which affected the verdict in this case. The statements complained of are insignificant in light of the facts and circumstances of the case; the court did not undertake curative measures because trial counsel did not object; the prosecutor intended to persuade the jury to convict Petitioner; there was no significant cumulative effect of the improper comment; and the State's case against Petitioner was strong. Petitioner has not shown that counsel's failure to object to the prosecutor's argument prejudiced him. Petitioner is not entitled to relief on this claim.

*Hearsay testimony at post-conviction hearing*

Finally, Petitioner contends that the post-conviction court erred by excluding testimony of Petitioner's mother, Ms. Clark, about statements she heard the prosecutor make to Petitioner's sister, Ms. Musick, during a meeting prior to Petitioner's trial.

At the post-conviction hearing, Petitioner attempted to question his mother, Ms. Clark, about a meeting between the prosecutor and Petitioner's sister, a witness for the State, at which Ms. Clark was present. Petitioner's counsel asked Ms. Clark, "What, if anything, instructions, did you hear the attorney general give your daughter?" The post-conviction court sustained the State's objection on the basis of hearsay.

Petitioner asserts that the trial court erred and relies on the Tennessee Supreme Court's opinion in *Plyant v. State*, 263 S.W.3d 854 (Tenn. 2008). In *Plyant*, the petitioner claimed that counsel was ineffective for failing to present proof at trial that another individual, Ms. Davis, had allegedly confessed to the crime for which the petitioner was on trial. *Id*. at 869. At the post-conviction hearing, the petitioner attempted to call several witnesses to whom Ms. Davis had allegedly confessed. *Id*. The post-conviction court refused to allow the testimony of those witnesses, ruling that it was hearsay. Our supreme court concluded that the post-conviction court abused its discretion by not allowing the testimony because the testimony was not offered for the truth of the matter asserted, *see* Tenn. R. Evid. 801(c), but rather to show that the petitioner received ineffective assistance of counsel. *Plyant*, 263 S.W.3d at 870.

While it may have been error for the post-conviction court to sustain the State's hearsay objection, we cannot reach that decision because Petitioner did not make an offer of proof of the testimony he sought to elicit from Ms. Clark. *See* Tenn. R. Evid. 103. We are unable to speculate as to what Ms. Clark's testimony would have been, had the State not objected. Accordingly, we cannot conclude that the trial court erred.

## CONCLUSION

Based on the foregoing, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE